[Cite as *Toledo v. SL Hauling & Renovation, L.L.C.*, 2026-Ohio-2700.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

CITY OF TOLEDO

COURT OF APPEALS NO. {48}L-25-00226

APPELLEE

TRIAL COURT NO. CVH-25-11536

V.

SL HAULING & RENOVATIONS,
LLC, ET AL.

APPELLANTS

**<u>DECISION AND JUDGMENT</u>**

Decided: July 14, 2026

* * * * *

Dale R. Emch, City of Toledo Director of Law,
Jeffrey B. Charles, and Zachary G. Lemon, for appellee.

Hassanayn Joseph, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

**{¶ 1}** Appellants, SL Hauling & Renovations, LLC and Tres Hermanos Holdings, appeal from the October 20, 2025 judgment of the Toledo Municipal Court, Housing Division, granting appellee, the City of Toledo, a permanent injunction and ordering their premises to be padlocked for a period of one year. Appellants argue that the trial court

erred in ordering a closure that will last longer than one year, that it lacked subject matter jurisdiction to issue the injunction, and that it violated their constitutional due process right to notice and an opportunity to be heard on the injunction. For the following reasons we affirm, in part, and reverse, in part, the trial court's judgment.

## II. Facts and Procedural Background

{¶ 2} On July 10, 2025, the City of Toledo filed a complaint for preliminary and permanent injunction, with an accompanying motion for temporary restraining order ("TRO"), in the Toledo Municipal Court, Housing Division. The complaint alleged that appellants were maintaining a public nuisance through their operation of the Agenda Sports Bar ("the Bar") on their premises. On July 11, 2025, the trial court held a hearing on the City's motion for a temporary restraining order. Before beginning the hearing, the trial court offered the parties the opportunity to address any preliminary issues before accepting testimony. Relevant to the present appeal, appellants did not argue that they had not been served with the City's Complaint. The City then elicited testimony from Toledo Police Department Sergeant Joseph Okos. Sergeant Okos identified several police reports reflecting dangerous incidents in and around the Bar to which the Toledo Police Department had to respond and, in multiple incidents, arrests of the Bar's patrons. Appellants' representative and owner of the Bar, Sean Love, testified that the Bar was being punished due to incidents that occurred nearby but were unrelated to its operation. He further testified that he had increased security and, should the incidents nearby continue to occur that he would begin closing early to avoid the problems in the area. At

2.

the conclusion of the hearing, the trial court granted a TRO that permitted the City to padlock the Bar and prohibit appellants from operating it pending a final hearing on the City's complaint. The matter was set for a preliminary injunction hearing on July 22, 2025. The TRO was set to expire on July 25, 2025. At the hearing, both parties agreed to continue the matter until August 4, 2025, and to extend the expiration of the TRO to the new hearing date. The trial court's order memorializing the continuance did not inform the parties that the new hearing would resolve the City's request for a permanent injunction.

{¶ 3} Contemporaneous with the July 22, 2025 hearing, appellants filed a "motion to deny request for injunctive relief." In their motion, appellants renewed arguments similar to those Love testified to at the TRO hearing and requested that the trial court deny the City's request for injunction. Appellants did not allege improper service of the complaint when they appeared for the July 22, 2025 hearing or in their motion.

> At the beginning of the Augst 4, 2025 hearing, the trial court stated:
> We had the preliminary hearing earlier. This has been continued for the full hearing. The last time there was some talk amongst the parties, and it was continued again. My understanding in speaking to the attorneys, off the record, is that in fact that today we need to do the full hearing. Is that correct?

The parties agreed that they were present to conduct a "full hearing" on the City's request for permanent injunction. Again, appellants did not allege that they had not been properly served with the complaint. The parties then proceeded with the hearing and elicited the following testimony:

3.

**Testimony of Monica Southward**

{¶ 4} Ms. Southward is the president of First Express, a trucking company located "two doors east" of the Bar. At the time of the hearing, Southward had been president and part owner of First Express for approximately thirty years. She testified that over several years, she had witnessed the accumulation of litter around the property and multiple instances of public urination by patrons of the Bar. She also described an issue wherein patrons of the Bar parked their vehicles in front of the gate to First Express's parking lot, preventing its employees and trucks from entering and exiting. As a result of these issues, First Express reduced its operating hours from 24 hours a day to closing on Friday nights and reopening on Sunday mornings. She testified that in the month prior to the hearing—since the TRO had been in place—that these issues were "completely gone."

{¶ 5} Southward was next presented with an August 29, 2022 police report related to First Express contacting the Toledo Police Department due to the Bar's patrons blocking their entrance. She confirmed that she had contacted the police on that date and "often" afterwards. She also testified that First Express had to move the fence around its parking lot further out to ensure that their employees had a place to park. Otherwise, the Bar's patrons would take their parking spaces. She also noted that the fence had been damaged by the Bar's patrons.

{¶ 6} On cross-examination, Southward could not recall the date the fence was damaged but stated that it was within the last five years. She also confirmed that the

4.

public urination she observed was on her company's security cameras and not through personal observations. She also described the timing of the incidents, indicating that they occurred beginning on Friday evenings and that they would discover litter and debris from the Bar when First Express reopened on Sundays. She also testified that trash remained in the area despite the Bar having been closed in recent weeks.

### Testimony of Dirk Ward

{¶ 7} Mr. Ward is the president and CEO of Raka Corporation. His offices are located next door to the Bar. He testified that he would like to expand his business but that incidents related to the Bar temper those considerations. These incidents include damage to the company's gate by the Bar's patrons on two occasions. One of these incidents, that occurred earlier in 2025, caused nearly $10,000 in damages. He also testified that he had adjusted his company's hours to close early on Fridays to avoid issues with Bar patrons blocking their lot entrances. To avoid their employees losing hours due to closing early, his company adjusted its start times to begin at 5:30 a.m. On cross-examination, Ward described not only the parking lot gates being blocked but also cars blocking the road leading into the properties due to Bar patrons "double parking" on the street. Although he had reported this issue to the police, he did believe he received an adequate response to address the issue.

### Testimony of Officer Joseph Mahn

{¶ 8} Officer Mahn testified that he is a patrolman with the Toledo Police Department. In that capacity, he is tasked with responding to calls for service and

5.

enforcing traffic and criminal codes in "East Toledo." He confirmed that his geographic patrol area does not include the Bar but that he has been called into that area to assist other officers. After confirming that he had prepared a police report related to one of these instances in July, 2023, he recounted the events that led to the report. On that night, a deputy sheriff who had been hired to perform private security for the evening called the Toledo Police Department to request assistance with a large crowd outside the Bar that had gathered and refused to leave. Officer Mahn testified that several members of the crowd had to be arrested before the remaining members of the group left.

{¶ 9} Officer Mahn next provided a general overview of the nature of the calls he responded to in the area of the Bar. These included "cars parked in the grass, blocking driveways * * * just people gathered there." He noted that he had not responded to the area since 2023 due to a reassignment in his patrol area. On cross-examination, he confirmed that by the time he had arrived in the area for the July, 2023 incident that much of the crowd had dispersed at the deputy sheriff's request prior to his arresting those that refused.

### Testimony of Detective Ashlynn Pluff

{¶ 10} At the time of the hearing, Detective Pluff had been assigned to the Toledo Police Department's "Investigative Bureau and Property Crimes" for approximately one and a half months. She had previously been assigned to "field operations" in a geographic area that included the Bar. In that capacity, her "responsibilities were responding to calls for service and patrolling [her] geographical area."

6.

{¶ 11} After describing her background, Detective Pluff testified regarding her experience in responding to calls near the Bar. In August, 2022, she responded to a call for assistance with a parking complaint. When she arrived, she found an "excessive" amount of cars blocking the lane of travel and several business parking lots, including the lot belonging to First Express. She and the other responding officers worked to get the Bar's patrons to remove their vehicles. She believed that she responded to service calls in the area near the Bar approximately 20 to 30 times during the three years prior to the hearing. These typically included parking complaints and disorderly crowds. She also noted a "few incidents that [she] responded to where deputies were having problems with patrons and were requesting back up." During cross-examination, Detective Pluff explained that these incidents did not always result in a written report as they were mostly related to moving vehicles and dispersing crowds.

### Testimony of Officer Alexander Reil

{¶ 12} Officer Reil began his testimony by describing his current role with the Toledo Police Department as "Field Operations." He had been in that role since January, 2025, and was assigned to the geographic area that included the Bar. In that time, he had been called to the Bar and its surrounding area on three occasions. The first occurred in June, 2025, when he responded to a deputy sheriff's call for assistance in dispersing a crowd. Officer Reil estimated the crowd size at 100 people. The deputy working security was unable to control the crowd because he only had one other deputy working with him.

7.

{¶ 13} The second incident involved a reported assault. Officer Reil responded to the call and found "a group of females" that had been involved in a physical altercation in the Bar's parking lot. He took a report on the incident and the women "were removed from the property[.]" He did not elaborate on whether they had been arrested.

{¶ 14} The last incident involved a shooting that occurred "over the 4th of July weekend" in 2025. When Officer Reil arrived he began attending to two victims. He noted that there was a large crowd and since he saw other units responding, he continued to provide assistance to the victims. Once he completed that task, he assisted with dispersing the remaining crowd. He considered the shooting to be related to the Bar because it occurred in the general area, the call came from someone associated with the Bar, and that the other businesses in the area were not likely to have a crowd at that time.

{¶ 15} He had not been called to the area of the Bar since the TRO had been in place. Appellants, during, their brief cross-examination, elicited testimony showing that the Bar was closed at the time of the 3:00 a.m. assault Officer Reil described as his second response to the area.

{¶ 16} The City concluded its examination of witnesses with Officer Reil's testimony. It then requested that three police reports that had been used to refresh witness recollections be admitted into evidence. Appellants did not object and the reports were admitted. Appellants then began examination of their witnesses, who provided the following testimony:

8.

**Testimony of Deputy Robert Campbell**

{¶ 17} At the time of the hearing, Deputy Campbell had been employed with the Lucas County Sheriff's Office for twenty years. For the previous four years, he had served as the project manager for the office. Through this position, he coordinated a program that allowed deputies to "project" as security for local businesses during their time off, including, relevant to the present appeal, at the Bar. He described a typical night for these deputies working at the Bar as arriving at approximately 11:00 p.m. He testified that the Bar would begin to gather a crowd around 12:30 a.m. until it closed at 2:00 a.m. At that time, any deputies present would assist in dispersing the crowd from the exits and the surrounding areas. Deputies had previously worked at the Bar on Fridays, Saturdays, and Sundays, but had recently been limited to Sundays due to smaller crowds. There were typically three deputies present on days they were working.

{¶ 18} Regarding the reported incidents the City attributed to the bar, Deputy Campbell noted that after they learned of calls from other businesses complaining about parking, he would station a deputy at other business's parking gates to avoid this issue. He also asked his deputies to ensure that the Bar's patrons stayed off of any grassy areas. Deputy Campbell disputed prior testimony claiming that surrounding businesses still suffered from adverse parking issues after he placed a deputy outside.[1] He testified that

---

[1] It is apparent that Deputy Campbell was present for others' testimony as he referenced previous testimony without prompting during his examination. The transcript shows that neither party requested that witnesses be separated prior to their testimony.

9.

he never felt unsafe while working at the Bar and that if he ever needed assistance he would call the Toledo Police Department.

{¶ 19} Appellants' counsel then directed Deputy Campbell to the July, 2025 shooting. He testified that while he had been present for "fights" at the Bar that there had never been another shooting. He believed that the shooting was "not a [Bar] problem" but a "City of Toledo problem to where we're having these kinds of incidents everywhere." As a result, he questioned "why are we blaming one business [the Bar] for a Toledo problem?" He described the shooting as having occurred 40 to 50 yards from the Bar's property. He speculated that the animus behind the shooting was conduct that occurred elsewhere and that any violence was "all the way out of the normal" for the Bar.

{¶ 20} On cross-examination, Deputy Campbell clarified that deputies had not worked an entire weekend at the Bar in the past three years. He also explained that he had never reviewed any surveillance video captured by the surrounding business or spoken with their owners. He noted that he knew several of the individuals involved in the then-recent shooting—both those that he had been told were the perpetrators and the victims—and that he believed they all had grown up together in the area. He expressed surprise that there would be any violence among them. He declined to describe the groups as gangs but conceded that they were "affiliated" with certain neighborhoods.

{¶ 21} Deputy Campbell then elaborated on his calling for assistance during his time working at the Bar. He attributed these calls to instances in which the crowds were moving too slowly and his fellow deputies wanted to finish their work and leave. He

10.

could not recall a time in which he asked for assistance due to being in fear of the crowd. At some point, he instructed the deputies working at the Bar to not contact the Toledo Police Department for assistance with crowds due to his belief that the other officers complained about being called to assist another department's deputies. He also explained that because the Bar had been placed on the Toledo Police Department's "list" of nuisance locations that the Lucas County Sheriff would not allow him or any other deputies to perform security work there.

### Testimony of Sean Love

{¶ 22} Mr. Love began his testimony stating that he is the owner of the Bar. He had owned the bar for "about four years" at the time of the hearing and it had 26 employees. The Bar is typically open seven days a week. He then discussed, at length and without a question before him, his concerns with the City's initiation of these nuisance proceedings, stating that there had only been fifteen incidents that resulted in a police report since he purchased the Bar. He questioned why the City attributed these incidents, most of which he described as minor parking violations, to the Bar. He also stated that the shooting was "premeditated" off-site and had nothing to do with the Bar.

{¶ 23} Mr. Love next described the efforts he has made to alleviate the conduct the City described as a nuisance. These included hiring additional bouncers, installing metal detectors and cameras, and limiting the number of events that draw larger crowds. He also expressed a willingness to add additional measures at the City's request. He expressed his concern that he was purportedly not made aware that the City considered

11.

the property to be a nuisance until it initiated the underlying proceedings. He further testified that the issuance of the TRO has resulted in lost income for himself and his employees.

{¶ 24} During the City's cross-examination, Love testified that his belief that the July, 2025 shooting was premeditated outside the Bar's premises was based on social media postings and text messages showing that the "people" involved "had problems prior to" arriving at the Bar. He also testified that he personally picks up any trash and debris left on or around the Bar's premises every Sunday. He did concede that the Bar's patrons parked on property that he did not own but that these issues were dealt with in a timely manner and that he did not want his Bar to negatively impact the surrounding businesses. Love also stated that he was trying to work with the Lucas County Sheriff's Office to get their deputies back as additional security.

### Closing arguments, supplemental briefs, and judgment

{¶ 25} At the conclusion of Love's testimony, the parties presented the court with closing arguments. The City argued that the evidence showed the Bar was a public nuisance as it constituted a danger to the public based on crowd issues and violent incidents. Appellants argued that the evidence showed that the incidents related to the Bar were minor parking violations and that the shooting was unrelated to the Bar. The trial court took the matter under advisement and permitted the parties to submit additional written arguments.

12.

{¶ 26} The City filed its supplemental brief on August 8, 2025. Therein, the City essentially renewed its argument that the Bar was the site of multiple violent crimes and had a negative impact on surrounding businesses. Appellants did not file a supplemental brief.

{¶ 27} On August 13, 2025, the trial court entered a final judgment granting the city its requested permanent injunction. It held that appellants' operation of the Bar constituted a public nuisance based on "police testimony, eyewitness accounts, and incident reports" showing that the Bar had been "the site of repeated violent and criminal incidents from 2022 onward." It further held that "[t]his persistent criminal activity directly satisfies the statutory definition of a nuisance by endangering the health, safety, life, and limb of patrons, employees, and the surrounding community." Having found the Bar to be a nuisance, the court ordered appellants to cease operation of that nuisance and extended the Bar's closure, originally ordered through the TRO, to continue until one year from the date of the final judgment.

{¶ 28} Appellants timely appealed from the trial court's judgment on September 12, 2025. On September 24, 2025, we remanded the appeal to the trial court for further proceedings to resolve the City's claim for attorney's fees as it had not been addressed. On October 20, 2025, the trial court entered a judgment entry resolving all claims. We ordered the appeal returned to the active docket on October 28, 2025. Appellants filed an amended notice of appeal reflecting the new judgment entry on November 13, 2025. We now proceed from this amended notice of appeal.

13.

### III. Assignments of Error

{¶ 29} Appellants assert the following errors for our review:

1. The trial court abused its discretion for ordering appellants' property and business closure for 15 months until October 17, 2026 instead of the statutorily required one year period pursuant to [Toledo Mun.Code] 533.21 and R.C. 3767.

2. The trial court abused its discretion by issuing a preliminary and permanent injunction yet it admits the complaint did not specifically cite R.C. 3767.01 and thus the trial court lacked subject matter jurisdiction and its actions are therefore a nullity.

3. The City of Toledo attempts to use the Toledo Municipal Codes on nuisance to circumvent the Ohio Revised Code because the municipal code removes judicial safeguards provided by R.C. Chapter 3767 violating fundamental property and due process rights and the trial court erred and abused its discretion because the [Toledo Mun.Code] on nuisance and nuisance abatement is unconstitutional as applied.

4. City of Toledo's removal of "criminal conviction required" from municipal code 533.21 directly conflicts with Revised Code 3719.10.

5. Appellants were never served the summons with the complaint attached at required by Civ.R. 4(B). Service was not reasonably calculated to notify appellants of the lawsuit.

6. The trial court erred by providing improper notice of hearing on the merits by providing appellants a notice of a temporary restraining order.

7. The trial court erred by de facto consolidating the preliminary injunction with the trial on the merits without providing notice violating appellants' due process rights.

8. The trial court erred by its decision to padlock appellants' property without making a separate determination, as required by the Supreme Court decision in *Rezcallah,* on whether appellee provided by clear and convincing evidence appellant had knowledge of and either acquiesced, participated, and/or perpetuation the nuisance, in violation of the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause of the United States Constitution, and Section19, Article I of the Ohio Constitution.

9. The trial court erred by disregarding appellants' right to written notice which he was entitled to as the "owner" as defined in Chapter 1726 violating appellants' due process rights guaranteed by the Fourteenth Amendment of the U.S. Constitution, and Section 19, Article I of the Ohio Constitution.

10. The trial court erred by issuing appellee a temporary restraining order without specifically, in terms, setting forth the reasons for its issuance or describing in reasonable detail the acts sought to be restrained, and without specifying immediate and irreparable injury.

11. [Toledo Mun.Code] Chapter 1726.01 is unconstitutionally void for vagueness as applied.

We address appellants' assignments of error out of order, beginning with those that involve threshold issues that would render the remaining assignments moot if found well-taken, followed by those that are interrelated or resolved on the same procedural grounds, and concluding with the remaining assignments of error on their merits.

## IV. Law and Analysis

### a. The trial court had subject matter jurisdiction over the City's claims.

{¶ 30} We begin with appellants' second assignment of error in which they argue, as a threshold matter, that the trial court, the Toledo Municipal Court, Housing Division, lacked subject matter jurisdiction to grant the City's request for an injunction ordering the Bar closed for a period of one year. In support of their argument, appellants allege that the statutory authority the City invoked in its complaint does not permit the grant of such an injunction. We disagree.

{¶ 31} It is undisputed that a court's exercise of subject matter jurisdiction "is a prerequisite to a valid judgment." *State ex rel. Herring v. Greater Unity Baptist Church,*

15.

2002-Ohio-4944, ¶ 7 (6th Dist.). "Subject matter jurisdiction of a court connotes the power to hear and decide a case upon its merits and defines the competency of a court to render a valid judgment in a particular action." *Cheap Escape v. Haddox,* 2008-Ohio-6323, ¶ 6, citing *Morrison v. Steiner,* 32 Ohio St.2d 86 (1972). Municipal courts are "statutorily created [pursuant to R.C. 1901.01], and their subject matter jurisdiction is set by statute." *Id* at ¶ 7. R.C. 1901.18(A) provides the applicable law in this regard:

> Except as otherwise provided in this division or section 1901.181 of the Revised Code, subject to the monetary jurisdiction of municipal courts as set forth in section 1901.17 of the Revised Code, a municipal court has original jurisdiction within its territory in all of the following actions or proceedings * * *.

*Id.* To determine whether a municipal court has subject matter jurisdiction over certain actions, then, we must determine whether the action is one of those enumerated in R.C. 1901.18(A) and its subsections. *Id.*

{¶ 32} Here, R.C. 1901.18(A)(12) provides municipal courts with subject matter jurisdiction over "any civil action as described in division (B)(1) of section 3767.41 of the Revised Code that relates to a public nuisance[.]" R.C. 3767.41(B)(1) expressly grants a "municipal court, housing or environmental division of a municipal court, or county court" the authority to grant injunctions in furtherance of public nuisance abatement proceedings. In their brief, appellants concede that the trial court would have had subject matter jurisdiction over public nuisance proceedings initiated under R.C. Chapter 3767. Their argument on appeal, however, is that because the City filed its complaint pursuant to authority granted through the Toledo Municipal Code, and because

16.

the Toledo Municipal Code nuisance ordinance they cited purportedly does not permit the granting of an injunction closing their business, that that the trial court lacked subject matter jurisdiction over the City's claim. Appellants' argument misstates the nature of the City's complaint and ignores additional authority granting subject matter jurisdiction to the trial court.

{¶ 33} First, appellants argue that the City's complaint alleged only a nuisance under Toledo Mun.Code Chapter 1726. Appellants correctly allege that Toledo Mun.Code Chapter 1726 provides a procedure through which the City may seek to abate public nuisances with certain remedies available to the City pursuant to Toledo Mun.Code 1726.99. An injunction locking the owners out of the premises for a period of one year is not expressly identified as a remedy available to the City in Toledo Mun. Code 1726.99.[2] This court has previously held that we limit our consideration of the municipal court's subject matter jurisdiction over nuisance actions to the manner in which they are alleged in the City's complaint. *See Herring,* 2002-Ohio-4944, at ¶ 8 (6th Dist.) (holding that because the City's complaint limited its claims to seek remedies under R.C. 3767.03 rather than the municipal code, and because R.C. 3767.04 limited the granting of the requested remedy to the common pleas court, that the municipal court

---

[2] We note that Toledo Mun.Code 1726.99 allows for the Toledo Municipal Court's Housing Division to "order the owner" to "[a]bate the nuisance." Neither party addressed the scope of this remedy and whether it could include an injunction barring the owners from the property. Because this issue was not argued by the parties, and because we resolve appellants' arguments on other grounds, we offer no opinion as to the scope of remedies available under Toledo Mun.Code 1726.99.

17.

lacked subject matter jurisdiction over the claims). Therefore, for the trial court to have subject matter jurisdiction over the City's claim, its complaint had to seek an injunction under some authority granting it jurisdiction.

{¶ 34} In its complaint, the City stated that it was seeking relief through an action filed pursuant to Toledo Mun.Code 533.19 in addition to Toledo Mun.Code Chapter 1726. Toledo Mun.Code 533.19 provides "a nuisance as defined in § 1726.01 [of the Toledo Mun.Code] is declared a nuisance for purposes of §§ 533.20 and 533.21". Toledo Mun.Code 533.21 states:

> If the existence of the nuisance is established in an action as provided in this chapter, *an order of abatement shall be entered as a part of the judgment in the case*, which order shall direct the removal from the building or place of all furniture, fixtures and contents therein and shall direct the sale thereof in the manner provided for the sale of chattels under execution, and the *effectual closing of the building or place against its use for any purpose, and so keeping it closed for a period of 1 year*, unless sooner released as in this chapter provided.

(Emphasis added.) Thus, the plain language of Toledo Mun.Code 533.21 permitted the trial court to order a one-year closure of the Bar upon finding that it was a public nuisance, establishing that it had subject matter jurisdiction over the City's claim. Appellants' argument that Toledo Mun.Code 1726 does not permit such an order is irrelevant to determine whether the trial court had subject matter jurisdiction over the claim through Toledo Mun.Code 533.21.

{¶ 35} In sum, the trial court had subject matter jurisdiction over the City's requested injunction under both R.C. 1901.18(A)(12) and Toledo Mun.Code Chapter 533. Appellants' argument that Toledo Mun.Code Chapter 1726 does not authorize the

18.

granting of an injunction does not refute these clear grants of jurisdiction. Therefore, the trial court had subject matter jurisdiction over the City's claims and we find appellants' second assignment of error not well-taken.

> **b. The trial court's granting of a temporary restraining order is not a final appealable order.**

{¶ 36} Turning to their tenth assignment of error and another threshold issue, appellants argue that the trial court erred in granting the City's request for a temporary restraining order. The trial court initially granted the TRO on July 14, 2025.[3] The order was set to expire on July 25, 2025. On July 22, 2025, the trial court extended the TRO to the continued hearing on August 4, 2025 with the consent of the parties. On that date, the trial court conducted a hearing on the merits of the City's request for a permanent injunction. Thus, the TRO had expired at the time the trial court entered its judgment.

{¶ 37} "Courts do not review cases that no longer present live controversies." *M.R. v. Niesen,* 2022-Ohio-1130. Upon the expiration of a TRO, it is "no longer in effect" and the "appeal of the TRO is moot." *Id.* at ¶ 10. Because the TRO appellants challenge has expired, it is no longer a live controversy and their appeal is moot. Therefore, we find appellants' tenth assignment of error not well-taken.

---

[3] We note that the parties identify July 11, 2025 as the date the TRO was granted. However, the record shows that it was not journalized until July 14, 2025.

19.

## c. Appellants waived their arguments regarding alleged violations of their constitutional due process rights.

{¶ 38} Shifting our analysis to appellants' arguments that are resolved on procedural grounds, we turn to their third, fourth, and eighth assignments of error. In these assignments, appellants argue that they were denied their right to due process as guaranteed by the United States and Ohio Constitutions. While citing different statutory sections, each of these assigned errors alleges that the trial court failed to follow a prescribed procedure for the granting of an injunction within those statutes, thus denying appellants their right to due process.

{¶ 39} Having reviewed the record, we find that appellant did not raise any of these issues before the trial court. Appellant never filed an answer to the City's complaint, thus failing to make these arguments at their first opportunity. Moreover, at the beginning of each hearing, and in arguments made at hearing, appellants did not challenge the alleged lack of due process. In their lone filing referencing an alleged "due process" violation—that is, their motion to deny injunctive relief filed on July 22, 2025—appellants only referenced "due process implications of seeking closure of a lawful business" in the context of the City's failure to give them an opportunity to abate the nuisance through administrative proceedings—an issue we address below. They did not, however, allege that the proceedings the trial court utilized were insufficient to satisfy their due process rights and were therefore unconstitutional.

{¶ 40} The "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time

20.

of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Rivera,* 2025-Ohio-314, ¶ 20 (6th Dist.). "[A]ppellate courts will not consider errors which could have been, but were not, called to the attention of the trial court, including constitutional issues raised for the first time on appeal." *State v. Pitts,* 2023-Ohio-2005, ¶ 47 (6th Dist.). Because appellant never challenged the proceedings below as an unconstitutional violation of their due process rights, we decline to consider appellants's third, fourth, and eighth assignments of error for the first time on appeal and we find them not well-taken. *Id.*

### d. Appellants waived their argument that Toledo Mun.Code Chapter 1726 was "void for vagueness."

{¶ 41} In their eleventh assignment of error, appellants argue that Toledo Mun.Code Chapter 1726 is "void for vagueness" and cannot be applied to establish a nuisance. Specifically, appellants argue that the Chapter "does not provide [a]ppellants fair notice and sufficient definition and guidance to enable them to conform their conduct prior to losing their fundamental property interest rights." The record is devoid of any reference to appellants' argument that Toledo Mun.Code is unconstitutionally vague. Since appellants did not raise this issue with the trial court, they cannot raise it for the first time in this appeal. *Id.* As a result, we decline to address appellants' eleventh assignment of error and find it not well-taken.

21.

### e. Appellants failed to preserve their lack of service defense.

{¶ 42} We also resolve appellants' fifth assignment of error on similar procedural grounds due to their waiver of a lack of service defense. In this assignment, appellants argue that the underlying action was never properly commenced because they had not been served with a summons and copy of the complaint as described in Civ.R. 3 and 4. It is undisputed that a party that has not been properly served with the summons and a copy of the complaint may seek dismissal of the action pursuant to Civ.R. 12(B)(5) through a motion or in a responsive pleading. Here, appellants did not file a motion to dismiss or a responsive pleading but voluntarily appeared to defend the City's action. "[I]f a defendant voluntarily appears at a hearing and participates without moving to dismiss the action for lack of proper service, the defendant waives any defects in service and the trial court has personal jurisdiction over the defendant." *Toledo v. AH & TQ, Inc.,* 2023-Ohio-2790, ¶ 26 (6th Dist.), citing *McLemore v. Clinton County Sheriff's Office,* 2023-Ohio-1604, ¶ 49 (12th Dist.). The record shows that appellants appeared in this action but failed to preserve their lack of service defense. As a result, they waived that defense and we decline to address their argument.

{¶ 43} We note appellant's reliance on *Ackman v. Mercy Health West Hospital, LLC,* 2024-Ohio-3159 to avoid this result. In that case, the Ohio Supreme Court held that a defendant's participation in a case did not establish waiver of their lack of service defense as such a waiver could only occur through the conduct identified in Civ.R. 12(H). A waiver under Civ.R. 12(H) occurs when the defense is not raised via motion or in a

22.

responsive pleading. Appellants argue, then, that their participation in this action should not serve as a waiver of their lack of service defense.

{¶ 44} We agree that participation in an action, on its own, does not serve as a waiver under Civ.R. 12(H). We clarify, however, that appellants' waiver is not based on their participation in this case but because they failed to preserve their defense in a motion to dismiss or a responsive pleading *while* participating in this case. Unlike appellants here, the defendant in *Ackman* had preserved that defense in his answer. *Id.* at ¶ 14. This preservation is the basis on which he could participate in the proceedings without waiving that defense. *Id.* at ¶ 4. *Ackman,* therefore, offers no support to appellants in their effort to avoid the clear waiver of their lack of service defense. As a result, we find appellants' fifth assignment of error not well-taken.

### f. The trial court did not err in consolidating the hearings on the City's request for preliminary and permanent injunctions.

{¶ 45} Having resolved appellants' assignments of error related to threshold and procedural issues, we now review the remaining assignments on their merits. In their sixth and seventh assignments of error, appellants argue that the trial court's notice of the permanent injunction hearing was insufficient as, respectively, it only referenced a hearing on a temporary restraining order and failed to notify defendants that the August 4, 2025 hearing would be on the merits of the City's request for a permanent injunction. The City argues that appellants' failure to object and their inability to show they suffered prejudice as a result of the allegedly insufficient notice results in a waiver of their argument on appeal.

23.

{¶ 46} Before addressing appellants' arguments, we find it is appropriate to clarify the manner in which the trial court notified the parties of the August 4, 2025 hearing. The parties' first appearance before the trial court was at the July 11, 2025 hearing on the City's request for a TRO permitting it to padlock the Bar and prohibit appellants from using it for the duration of the proceedings. The order was granted on July 14, 2025. At the conclusion of that order, the trial court stated "[t]his matter is set for further hearing relative to the Verified Complaint and the *Motion for Preliminary Injunction* on July 22, 2025[.]" (Emphasis added.) Both parties appeared on that date and agreed to continue the hearing until August 4, 2025. Appellants' argument in support of their sixth assignment of error rests with their claim that the trial court's notice of hearing only identified the subject matter of each hearing as resolving the City's request for a TRO. This is demonstrably false in light of the trial court's July 11, 2025 order stating that the next hearing was to resolve the City's request for a preliminary injunction. Therefore, we find appellant's sixth assignment of error not well-taken.

{¶ 47} We turn, then, to appellants' argument in support of their seventh assignment of error—that the trial court erred by converting the hearing on a preliminary injunction into a hearing on a permanent injunction. We agree with appellants that there is no notice in the record that indicates that the August 4, 2025 hearing would be on the merits of the City's request for a permanent injunction. Nevertheless, the matter proceeded to a hearing on the merits of the City's request on that date. The issue before

24.

us is whether the trial court's failure to notify appellant of the precise nature of the hearing constitutes reversible error.  It does not.

{¶ 48} Civ.R. 65(B)(2) governs the consolidation of a preliminary injunction hearing with a trial on the merits.  It states:

> Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (B)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

The trial court's failure to provide the parties with unambiguous notice of its intent to consolidate the preliminary injunction hearing with the hearing on the merits was error. *Ohioans for Concealed Carry v. City of Columbus,* 2019-Ohio-3105, ¶ 51 (10th Dist.). "However, in order to be entitled to reversal, a party must not merely demonstrate it was denied proper notice, but also that the denial of notice was prejudicial." *Id.* at ¶ 52.  "A party may establish prejudice by demonstrating that the lack of notice caused the complaining party to withhold certain proof which would show * * * entitlement to relief on the merits." *Id.*  That is, "a party must show, not only surprise but 'prejudice' in the sense of having other material evidence to introduce." *Id.,* citing *Johnson v. White,* 528 F.2d 1228, 1231 (2d Cir.1975).

{¶ 49} In their brief, appellants argue that they suffered prejudice in that they were denied "the opportunity for a case schedule, file written disclosures, partake in discovery, exchange witness lists, hire an expert and allow counsel to investigate this case fully" and

25.

"being denied a full and fair opportunity to develop testimony in response and to file an answer and affirmative defenses." They further argue that had they been able to obtain additional evidence, it would have refuted the City's claim by showing that they hired security, sheriff's deputies, and video surveillance to abate any claimed nuisance. The record does not reflect the prejudice appellants claim to have suffered.

{¶ 50} First, as noted above, appellants failed to object to the trial court conducting any of the hearings on the City's complaint. Instead, appellants appeared and conducted a thorough cross-examination of the City's witnesses as at both the July 11, 2025 hearing on the TRO as well as the August 4, 2025 hearing on the merits of the City's complaint. Second, appellants presented their own witnesses at the August 4, 2025 hearing to dispute the City's allegations. Their witness's testimony referenced their use of security, hiring deputies to provide additional security, and the incorporation of video surveillance and metal detectors to abate the alleged nuisance. This is the same evidence appellants now argue they could not have introduced due to the trial court's lack of notice of the nature of the hearing.

{¶ 51} Put simply, appellants had a full and fair opportunity to litigate the City's claim for a permanent injunction at the August 4, 2025 hearing despite the lack of notice that the preliminary and permanent injunction hearings would be consolidated. They introduced the exact same evidence they now claim they could not due to the prejudice suffered from the trial court's insufficient notice. We find that appellants' purported inability to seek some nebulous, other unidentified evidence to seemingly bolster

26.

evidence it already introduced is insufficient to show that they suffered prejudice as a result of the trial court's lack of appropriate notice pursuant to Civ.R. 65(B)(2). For these reasons, we find appellant's seventh assignment of error not well-taken.

### g. The trial court did not err when it issued an injunction without permitting appellants time to abate the nuisance.

{¶ 52} In their ninth assignment of error, appellants argue that the trial court erred by issuing an injunction when the City failed to provide them with notice of the nuisance and an opportunity to abate it in accordance with the administrative process described in Toledo Mun.Code 1726.02 and 1726.03. The City argues that the injunction constituted a "judicial remedy" it sought pursuant to Toledo Mun.Code 533.20 and was not subject to the administrative proceedings described in Toledo Mun.Code 1726. While appellant's assignment of error frames this as a due process violation, one that would have been waived as described above, appellants' motion to deny the injunction and their argument on appeal actually raised an exhaustion of administrative remedies defense. That is, appellants argue that the City could not proceed with the filing of their complaint to seek an injunction locking them out of their property pursuant to Toledo Mun.Code 533.20 until it exhausted the administrative remedies available to it in Toledo Mun.Code 1726.02 and 1726.03.

{¶ 53} The Toledo Mun.Code provides two administrative processes for abatement of a nuisance, the application of which depends on the nature of the nuisance. When a nuisance is identified and designated as one that places public health, safety or welfare in immediate danger, abatement of that nuisance is governed by Toledo

27.

Mun.Code 1726.02. That section requires notice of the nuisance to the owner of the premises and to require abatement of the nuisance within 72 hours or another time frame specified in the notice. Conversely, when the nuisance does not involve an immediate danger, Toledo Mun.Code 1726.03 provides for similar abatement proceedings but allows for a thirty-day window to abate the nuisance. Neither provision permits the City to seek an injunction before exhausting these administrative remedies.

{¶ 54} Toledo Mun.Code Chapter 533 provides a separate process for abating public nuisances. Specifically, Toledo Mun.Code 533.20 permits the City to "file an action to abate [public nuisances as defined in Toledo Mun.Code 533.19] and to perpetually enjoin any person * * * who shall own, lease, conduct or maintain such building * * * from permitting or suffering such building * * * to be used [to maintain a public nuisance.]" If the city successfully establishes a public nuisance in that action, "an order of abatement shall be entered as part of the judgment in the case * * * [including] the effectual closing of the building or place against its use for any purpose, and so keeping it closed for a period of one year[.]" Toledo Mun.Code 533.21(a). Nuisances as defined by Toledo Mun.Code 1726.01 are subject to this one-year closing period. Toledo Mun.Code 533.21.

{¶ 55} Reading these Chapters together, appellants argue that enforcement of a nuisance under Toledo Mun.Code 1726.01 can only be accomplished through administrative proceedings seeking to abate the nuisance before the filing of a civil action seeking an injunction. Appellants claim that this is a mandatory two-step process through

28.

which the City must exhaust the administrative proceedings in Toledo Mun.Code Chapter 1726 prior to filing the civil action authorized by Toledo Mun.Code Chapter 533. This is an incorrect reading of the ordinances in light of the distinct remedies they provide the City.

{¶ 56} "It is a well-established principle of Ohio law that a party seeking relief from an administrative decision must pursue available administrative remedies before pursuing action in a court." *Dworning v. Euclid,* 2008-Ohio-3318, ¶ 9. "The purpose of the doctrine * * * is to permit an administrative agency to apply its special expertise * * * in developing a factual record without premature judicial intervention." *Id.* "The exhaustion doctrine is not without exception. For instance, when there is a judicial remedy that is intended to be separate from the administrative remedy, the requirement of exhaustion of administrative remedies does not apply." *Id.* at ¶ 10.

{¶ 57} Whether the injunction the City sought through Toledo Mun.Code 533.21 is a judicial remedy that would excuse its exhaustion of the administrative remedies appears to be an issue of first impression for this court. We are guided, however, by the Twelfth District Court of Appeals's recent resolution of this same issue in *State ex rel. Pitstick v. Hastings,* 2025-Ohio-5093 (12th Dist.). In *Pitstick,* the defendants began operating a construction business at their home in violation of the local zoning code. *Id.* at ¶ 4-6. The city initiated a civil action pursuant to R.C. 3767.03 seeking, among other claims, a permanent injunction to prohibit the defendants from maintaining a nuisance on their property through the storage of commercial equipment. *Id.* Defendants argued that

29.

the city was required to exhaust their administrative remedies under local ordinances prior to seeking an injunction. *Id.* at ¶ 52.

{¶ 58} The court held that R.C. 3767.03 authorized a judicial remedy—the injunction—that was "intended to be separate from the administrative remedy" established in the local ordinance. *Id.* at ¶ 57. It further held that "[t]he existence of administrative procedures does not foreclose the separate judicial remedy explicitly provided by statute, particularly where the statutes contain no exhaustion requirement." *Id.* at ¶ 55. "The statutory language created independent legal pathways for seeking injunctive relief, which are separate and distinct from a municipality's administrative enforcement regime." *Id.* at ¶ 58. Based on these conclusions, the trial court held that the city did not have to exhaust its administrative remedies prior to seeking the injunction as a distinct judicial remedy. *Id.* at ¶ 59.

{¶ 59} Here, Toledo Mun.Code Chapter 1726 provides the City with administrative remedies to abate public nuisances. Toledo Mun.Code Chapter 533 provides the City with the right to seek an injunction closing a business that maintains a public nuisance for a period of one year. There is no requirement in the Toledo Municipal Code that mandates exhaustion of the administrative proceedings before seeking an injunctive remedy. That injunction is a judicial remedy that provides an "independent pathway" through which the city could seek to abate a nuisance. Applying the guidance established in *Pitstick,* we find that the trial court did not err in considering the City's request for an injunction pursuant to Toledo Mun.Code 533.21

30.

before the City exhausted the administrative remedies available to it in Toledo Mun.Code Chapter 1726 when neither ordinance contained an exhaustion requirement. For these reasons, we find that the trial court did not err in granting the City's request for an injunction pursuant to Toledo Mun.Code 533.21 and we find appellants' ninth assignment of error not well-taken.

### h. The trial court erred in extending appellants' business beyond the one-year limit described in Toledo Mun.Code 533.21.

{¶ 60} Finally, in their first assignment of error, appellants argue that the trial court erred in granting the City's request to close their business from the date of the July 14, 2025 TRO until October 20, 2026—one year from the date of the trial court's order on remand from this court[4]. This results in the closure of appellants' business for a period of approximately 15 months. Appellants argue that this exceeds the one-year closure authorized by Toledo Mun.Code 533.21. We agree.

{¶ 61} "The interpretation and application of a statute is a question of law subject to de novo review." *Strong v. Toledo,* 2024-Ohio-4613, ¶ 11 (6th Dist.). "If the terms of a statute are clear and unambiguous, the statute must be applied without interpretation." Toledo Mun.Code 533.21 authorized the trial court to enter an injunction to establish the "effectual closing" of the Bar, and "so keeping it closed for a period of 1 year[.]" *Id.* at ¶ 12. This ordinance is clear and unambiguous in establishing a one-year limit for which

---

[4] The trial court's October 20, 2026 judgment entry following our remand ordered the Bar to be closed for a period of one year from that entry.

31.

the trial court could order the Bar closed. As a result, any order extending the closure beyond one year is contrary to law and constitutes reversible error.

{¶ 62} The City concedes that the trial court's October 20, 2025 order impermissibly exceeds the one-year limit. It argues, however, that the closure should last from the date of the trial court's original judgment entry on August 13, 2025 rather than from the July 14, 2025 closure through the issuance of a TRO. This argument is contrary to the plain language of the ordinance as there is no provision authorizing calculation of the one-year closure from the final judgment only. *Compare State ex rel. Rothel v. Smith,* 2002-Ohio-7328, ¶ 94-98 (9th Dist.) (holding that the injunction ordering a property closed could exceed one year when the statute through which it was granted expressly permitted the order to last one year *from the final judgment* despite the property having been closed through a TRO several weeks prior to that judgment). For these reasons, we find appellants' first assignment of error well-taken.

## V. Conclusion

{¶ 63} For the foregoing reasons, we find appellants' first assignment of error well-taken. We find each of appellants' remaining assignments of error not well-taken. Therefore, we affirm, in part, and reverse, in part, the October 20, 2025 judgment of the Toledo Municipal Court, Housing Division. We find that the trial court's order closing the Bar expires one year from its initial closing of the Bar through its TRO—that is, the order expires on July 14, 2026. The City shall remove any locks or other mechanism barring appellants from entering the Bar on or before July 15, 2026. We note that

32.

appellants filed a motion for an injunction to preclude the trial court form extending the Bar's closure beyond that date. As a result of our resolution of this appeal, we find that motion has been rendered moot and it is hereby denied. We affirm the balance of the trial court's October 20, 2025 judgment entry.

{¶ 64} Pursuant to App.R. 24, the parties are ordered to share the costs of this appeal.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

| Thomas J. Osowik, P.J. | [[Applied Signature]] |
| | JUDGE |
| Christine E. Mayle, J. | [[Applied Signature 2]] |
| | JUDGE |
| Gene A. Zmuda, J. | [[Applied Signature 3]] |
| CONCUR | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

33.